**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**LIBERTY SURPLUS INSURANCE CORPORATION**,

     Plaintiff,

v.

**NORFOLK SOUTHERN RAILWAY COMPANY**,

     Defendant.

Civil Action No. 7:14-CV-142 (HL)

**NORFOLK SOUTHERN RAILWAY COMPANY,**

     Counterclaim Plaintiff,

v.

**LIBERTY SURPLUS INSURANCE CORPORATION,**

     Counterclaim Defendant.

**ORDER**

Before the Court are Plaintiff's Motion for Summary Judgment (Doc. 33) and Defendant's competing Motion for Summary Judgement (Doc. 34).  After reviewing the pleadings, briefs, affidavits, and other evidentiary materials presented, and with the benefit of oral argument, the Court determines that there is no genuine dispute of the material facts and finds that Defendant is entitled to

judgment as a matter of law. The Court accordingly grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

The following material facts are not in dispute:

On March 14, 2012, Tarhonda Rochelle Palmer filed a lawsuit in the Superior Court of Cook County, Georgia with the caption <u>Tarhonda Rochelle Palmer v. Georgia Southern and Florida Railway Company, Norfolk Southern Railway Company, Norfolk Southern Corporation, David Neubaurer, and W.F. Whitehead</u>, No. 2012CV056 ("Underlying Litigation"). In her Complaint, Ms. Palmer asserted that on June 1, 2011, she was driving her 2011 Chevrolet Aveo in an easterly direction on Talley Street in Adel, Georgia. Ms. Palmer alleged that as she approached the Talley Street railroad crossing, a number of factors, including a purportedly defective warning system and a view obstructed by the controller cabinet, parked box cars, and overgrown vegetation, impaired her ability to see an approaching train. Ms. Palmer proceeded to drive across the railroad crossing and was struck by an oncoming train, causing her to suffer extensive personal injuries, including severe burns and a traumatic brain injury.

On May 11, 2012, Defendant Norfolk Southern Railway Company ("Norfolk Southern")[1], along with Norfolk Southern Corporation and Georgia Southern and

---

[1] Norfolk Southern is a wholly owned subsidiary of Norfolk Southern Corporation and operates an interstate freight railroad in Georgia and other states.

Florida Railway ("Georgia Southern")[2], referred to collectively as the "Railroad Defendants" in the Underlying Litigation, filed a joint Answer to Ms. Palmer's Complaint generally denying liability for Ms. Palmer's injuries. Later, on April 1, 2013, Ms. Palmer amended her Complaint to add NaturChem, Inc. ("NaturChem") as a defendant to the Underlying Litigation and to include additional allegations that NaturChem negligently managed and controlled the vegetation at the Talley Street Crossing, a service NaturChem contracted with Norfolk Southern to provide.

Beginning in April 2005, Norfolk Southern and NaturChem entered into a Crossing Maintenance Agreement, which is known to the parties as Crossing Maintenance – GA Division AN4H00 ("Crossing Contract").[3] Pursuant to the contract, NaturChem is obligated

> to provide a Crossing Maintenance program inclusive of herbicides required to maintain acceptable control on the territory covered by this contract. Vegetation will be controlled on all quadrants of the crossing to maintain adequate site [sic] distance for the length of this contract.
>
> [NaturChem] will conduct an approved vegetation management program utilizing various methods to control brush and other undesirable vegetation that may obstruct visibility at the designated crossings.

---

[2] Georgia Southern is a wholly owned operating subsidiary of Norfolk Southern.
[3] The 2005 contract covered a six year period. (Doc. 1-4, p. 5). Norfolk Southern and NaturChem later renewed the contract for a new term, and the provisions of the 2005 contract remained in effect as of the date of Ms. Palmer's accident.

(Doc. 1-4, p. 2). Attached to the contract is a spreadsheet detailing each of the railroad crossings covered by the contract. (Id.). The Crossing Contract anticipates that new crossings will be added to the list at the beginning of each contract year. (Id. at p. 3). Additionally, while the parties to the Crossing Contract understood that NaturChem would apply herbicide a minimum of two times per year, the Crossing Contract provides that NaturChem "will monitor each of the crossings and perform required maintenance as often as necessary to maintain the crossing appropriately." (Id.).

The Crossing Contract further requires NaturChem to purchase liability insurance for itself and the "Railway." (Id. at p. 13). In accordance with this condition, NaturChem procured Railroad Protective Liability Policy Number RPHV214744-3 (the "Policy") from Plaintiff Liberty Surplus Insurance Corporation ("Liberty"), for the period of May 19, 2011 to May 19, 2012. (Doc. 1-3). The Policy, which specifically lists Crossing Maintenance – GA Division AN4H00 under the definition of "work" in the Declarations, provides up to $2,000,000 in coverage in the event that Norfolk Southern faces liability arising out of work performed by NaturChem under the terms of the Crossing Contract. (Id.).

Upon learning of the Underlying Litigation, an insurance broker for NaturChem alerted Liberty. Liberty confirmed with Norfolk Southern on May 28, 2013 that it had been sued and desired coverage under the Policy. Under a reservation of rights, Liberty agreed to pay 50% of the total cost of defending the

4

Railroad Defendants in the Underlying Litigation in fulfillment of Liberty's duty to provide a defense to Norfolk Southern. As the Underlying Litigation progressed, Liberty became aware of certain facts it believed potentially eliminated coverage under the Policy. On September 8, 2014, Liberty filed its Complaint for Declaratory Judgment, requesting this Court to determine its obligations under the terms of the Policy.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the

pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## II.   DISCUSSION

The parties do not dispute that the underlying purpose of the Liberty Policy is to insure Norfolk Southern for liability arising under the Crossing Contract entered into by Norfolk Southern and NaturChem. The parties further agree that the injuries sustained by Ms. Palmer as a result of the June 1, 2011 accident fell within the contract period and qualify as a "bodily injury" as defined under the terms of the Policy. However, Liberty argues that it is not obligated to indemnify Norfolk Southern for any liability arising from Ms. Palmer's accident at the Talley Street Crossing because (1) the accident occurred on a stretch of track that was not owned, maintained, or operated by Norfolk Southern, and Georgia Southern, a subsidiary of Norfolk Southern that purportedly owns the requisite portion of the track, is not an insured party under the Liberty Policy; and (2) the Policy excludes

6

coverage for any loss sustained once the contracted work has been performed and the job location returned to its intended use.[4]

## A.    Insured Party

While Liberty concedes that the injuries sustained by Ms. Palmer as a result of the collision qualify as a "bodily injury" as defined by the Liberty Policy, Liberty argues that the Policy does not extend coverage for work done on tracks owned by one of Norfolk Southern's subsidiaries. Looking to the terms of the Liberty Policy, Liberty contends that only Norfolk Southern, and not Georgia Southern, is an insured under the contract. Liberty further avers that it did not agree to insure Norfolk Southern for injuries caused by work that falls outside the scope of the Crossing Contract Liberty agreed to insure, namely on tracks that Norfolk Southern does not own.

Norfolk Southern does not suggest that the Liberty Policy lists any entity other than Norfolk Southern as a named insured. However, Norfolk Southern points out that the Liberty Policy contains no express exclusion for liabilities sustained by Norfolk Southern occurring on property owned by another entity. Additionally, Norfolk Southern emphasizes that in order to determine what Liberty agreed to insure, one must look not to the terms of the Liberty Policy but to the

---

[4] In its motion for summary judgment, Liberty raised an additional issue pertaining to Norfolk Southern's counterclaim for reformation of the insurance contract. Norfolk Southern did not oppose Liberty's motion on this issue. During the March 23, 2016 hearing on the motions for summary judgment, the parties agreed that Norfolk Southern's claim for reformation is moot. (Doc. 45, p. 28).

terms of Crossing Contract, which clearly sets out the various railroad crossings NaturChem agreed to maintain without any distinction as to the ownership of the track at each listed crossing. The Court agrees.

Under Georgia law, "[t]he construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1. However, the role of the court is "to construe the contract as written and not to make a new contract for the parties." Georgia Magnetic Imaging v. Greene Cty. Hosp. Auth., 219 Ga.App. 502, 504 (1995). "The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3.

> It is axiomatic that contracts must be construed to give effect to the parties' intentions, which must whenever possible be determined from a construction of the contract as a whole. Whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning.

First Data POS, Inc. v. Willis, 273 Ga. 792, 794 (2001); see also Garrett v. S. Health Corp. of Ellijay, Inc., 320 Ga.App. 176, 182 (2013) (where a contract's terms are plain an unambiguous, "the contractual terms alone determine the parties' intent").

The Court finds unavailing Liberty's argument that that there is no language or endorsement in the Liberty Policy that expands coverage under the Policy to any of Norfolk Southern's subsidiaries, including Georgia Southern. Indisputably, the Declarations page of the Policy lists Norfolk Southern Railway

Company as the named insured. However, it is clear from the plain terms of the Policy that the purpose of the Policy is not to insure Norfolk Southern for any liability arising from any acts or omissions by Norfolk Southern[5] but to provide coverage for any liability to which Norfolk Southern may be exposed as a result of NaturChem's performance, or lack thereof, under the controlling terms of the Crossing Contract. Accordingly, in order to resolve the issue of whether the Policy covers work performed by NaturChem on the particular portion of the railroad track where Ms. Palmer's accident occurred, the Court must look to the intent of the parties to the Crossing Contract.

Liberty claims that the Crossing Contract covers only work performed by NaturChem on railroad crossings owned by the "Railway", which the contract defines solely as Norfolk Southern. Liberty's interpretation reads words into the contract that simply do not exist. The Crossing Contract unambiguously provides: "Contractor will provide maintenance for the areas outlined for each crossing in Appendix B, 'Crossing for 2005 Maintenance', spreadsheet included with this Contract." (Doc. 1-4, p. 2). The contract goes on to state that during each contract year, the spreadsheet will be modified to include additional railroad crossings: "Crossings cleared by Norfolk Southern throughout the year will be added to the program at the beginning of each contract year. Each year the

---

[5] Norfolk Southern maintains independent insurance coverage for losses sustained as a result of its own liabilities. (Doc. 42-2).

payment schedule will be revised based on the number of additional crossings." (Id. at p. 3).

The original spreadsheet attached to the 2005 Crossing Contract is not a part of the record; however, the spreadsheet provided to NaturChem in 2008, which clearly lists the Talley Street crossing, has been made available for the Court's review. (Doc. 42-3, p. 15). Conspicuously absent from either the Crossing Contract or the spreadsheet that directed NaturChem as to which crossings Norfolk Southern desired the contract to encompass is any mention of who owns the track at each crossing. Liberty does not dispute that it received a copy of the 2005 crossing spreadsheets during its evaluation of NaturChem's insurance application. Rather, Liberty admits in its supporting brief that the 2005 version of the spreadsheet listed every crossing in Norfolk Southern's Georgia Division. (Doc. 33, p. 13). The uncontroverted evidence further demonstrates that Liberty's underwriter reviewed the spreadsheets (Doc. 34-11, p. 12) and even inquired of NaturChem's insurance broker about how the locations listed in the contract were determined (Doc. 34-15). At some point, however, Liberty appears to have applied its own interpretation of the column of the crossing spreadsheet entitled "RR" to determine that the abbreviation designates which railroad company owns the track at each crossing. As was clarified at the hearing on these motions, and explained in even more detail in the Declaration of John Darrington, Norfolk Southern's Director of Engineering, the "RR" delineates not who owns a

particular crossing but to identify whether the crossing is included in the Norfolk Southern System. (Doc. 37-4, p. 3; Doc. 45, pp. 39-40).[6]

Liberty's unilateral misapprehension of which entity owned each of the railroad crossings included in the Crossing Contract spreadsheet in no way undermines the clear intent of Norfolk Southern and NaturChem to include all of the listed crossings regardless of ownership. Liberty claims that it was not aware that NaturChem was performing work owned by Norfolk Southern's subsidiaries and that Norfolk Southern is now asking the Court to expand the scope of the contract. However, Liberty's argument is without merit and is not supported by the plain language of the contract. It is clear to the Court that in creating the spreadsheet of crossings, Norfolk Southern and NaturChem agreed that NaturChem would provide maintenance services throughout Norfolk Southern's entire regional system, regardless of whether Norfolk Southern or one of its subsidiaries owned the track. Any loss sustained by Norfolk Southern as a result of work performed by NaturChem at the Talley Street crossing located in Adel, Georgia, which is explicitly listed in the crossing spreadsheet in effect at the time of Ms. Palmer's accident, thus is clearly covered by the Liberty Policy.

---

[6] Norfolk Southern's Georgia Division includes track and crossings owned either by Norfolk Southern or one of its three wholly-owned subsidiaries, including Georgia Southern. (Doc. 34-3, p. 3). Throughout the Division there are 380 railroad crossings. (Id.). Of those 380 crossings, Norfolk Southern owns only 59, or approximately 16 percent. (Id.).

**B.     Completed Work Exclusion**

Liberty next argues that, even if the Court determines that Talley Street crossing is included within the scope of coverage afforded by the Policy, the Completed Work Exclusion precludes coverage. That particular provision of the Policy eliminates the following from coverage:

> "Bodily injury" or "property damage" occurring after the "work" is completed. The "work" will be deemed completed at the earliest of the following times:
>
> (1) When all the "work" called for in the "contractor's" contract has been completed.
>
> (2) When all the "work" to be done at the "job location" has been completed.
>
> (3) When that part of the "work" done at the "job location" has been put to its intended use by you, the governmental authority or other contracting party.

(Doc. 1-3, p. 6).

According to Liberty, NaturChem completed its herbicide application on March 3, 2011, 90 days prior to Ms. Palmer's accident. NaturChem's "work" at the track at the Talley Street crossing, or the "job location", thus had been returned to its intended use. Therefore, the Completed Work exclusion applies. Liberty's argument relies on the proposition that the Policy only covers any liability that might arise while NaturChem is physically present at the crossing and actively spraying the area's vegetation. Once NaturChem concludes its application, coverage under the Policy ends.

In support of its position, Liberty relies on a decision of the Appellate Court of Illinois in which that court interpreted the meaning of a similar "completed operations" exclusion. Liberty Mut. Fire Ins. Co. v. St. Paul Fire & Marine Ins. Co., 363 Ill. App. 3d 335, 842 N.E.2d 170 (2005). In that case, the contractor entered into two independent contracts, one to modernize two elevators and another to upgrade the two elevators. Id. at 174. The first contract, entered into on March 18, 1994, required the contractor to complete modernization of the elevators within 30 weeks and then to provide maintenance services for a period of twelve months. Id. Subsequent to the conclusion of the first contract, on February 12, 1996, the contractor entered into a second contract to upgrade the two elevators within eight weeks. Id. The second service contract provided for no additional maintenance or call-back services. Id.

On November 15, 1996, several months after the contractor completed the work anticipated by the second contract, an incident occurred involving one of the elevators. Id. Because the contractor had concluded the agreed upon upgrade project, and because the contractor had no continuing obligation under the contract to provide future maintenance services, the court concluded that the elevator had been returned to its intended purpose and that the completed operations exclusion applied. Id. The fact that one of the contractor's employees happened to be present performing maintenance on the date of the incident had no bearing on the court's determination that the exclusion precluded coverage

13

because at the time the contractor was not under a continuing contractual obligation to provide the maintenance services. Id. at 175.

The facts of the case before this Court are distinguishable from those cited in the St. Paul opinion. Here, the very essence of the Crossing Contract is for NaturChem to provide ongoing observation and maintenance of each of the railroad crossings listed in the crossing spreadsheet, including the Talley Street crossing. The contract itself is entitled "Crossing Maintenance Agreement" and contains language that clearly evidences the parties' intention that NaturChem would undertake "an approved vegetation management program" and would "be responsible for maintenance of each crossing throughout the length of the contract" as well as for monitoring each crossing and performing "required maintenance as often as necessary to maintain the crossing appropriately." (Doc. 1-4, p. 2). Additionally, the fact that the parties expected that NaturChem would apply herbicide a minimum of two times during each contract year does not forestall NaturChem's ongoing obligation to vigilantly monitor any unexpected vegetation growth along the tracks.

Again, in order to gain the benefit of the Completed Work exclusion, Liberty undertakes to read language into its Policy that does not exist. Nowhere in the exclusion is there language explicitly stating that in order for there to be coverage under the Policy, NaturChem's employees must be physically present and working on the tracks. Additionally, that part of the exclusion upon which

14

Liberty relies states that "work" is deemed completed when the "work" at the "job location" has been put to its intended use, not when the "job location" has been put back to use by the railroad as Liberty advocates. Here, the "work", which the Policy defines generally as the Crossing Contract, had not been returned to its intended use because NaturChem had an ongoing duty to maintain the vegetation. The Court therefore concludes that the Completed Work exclusion does not apply to eliminate coverage in this case.

## III.   CONCLUSION

Upon careful consideration of the arguments of the parties, the Court determines that the plain language of the two contracts at issue in this case afford coverage for the liability Norfolk Southern incurred as a result of incident at the Talley Street crossing in Adel, Georgia. The Court therefore denies Plaintiff's Motion for Summary Judgment (Doc. 33) and grants Defendant's Motion for Summary Judgment (Doc. 34).

**SO ORDERED**, this 3rd day of June, 2016.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**


aks